**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

KATHLEEN LANGSTON,      :
     Plaintiff      :
           :
     v.      :
           :      CIVIL NO. 1:15-CV-02027
MILTON S. HERSHEY MEDICAL      :
CENTER, *et al.*,      :
     Defendants      :

*M E M O R A N D U M*

*I.     Introduction and Background*

In this civil action, proceeding *via* an amended complaint (Doc. 19), Plaintiff, a citizen and resident of the Commonwealth of Virginia, files suit against the following Defendants: (1) Milton S. Hershey Medical Center ("HMC"), a hospital "affiliated with the University of Pennsylvania;" (2) Evangelos Messaris ("Messaris"), a Surgeon employed by HMC; (3) Walter Kothul ("Kothul"), the Chief of Colorectal Surgery at HMC; (4) Mount Nittany Medical Center ("Mt. Nittany"), a hospital organized under the laws of Pennsylvania, located in State College, PA; and (5) Madhavi Singh ("Singh"), a Physician employed by Mt. Nittany.[1]  (Doc. 19 at ¶¶ 6-10).  Plaintiff's claims arise under federal and state laws.

In particular, Plaintiff claims that: (1) HMC, Messaris, and Kothul deprived her of due process, in violation of 42 U.S.C. § 1983; (2) Hershey and Mt. Nittany violated Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("RA"); (3) Hershey and Mt. Nittany failed to stabilize an emergency medical condition before transferring her to outside medical facilities, in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"); (4) Messaris, HMC, Singh, and Mt. Nittany are

---

[1]     With respect to HMC and Mt. Nittany, Plaintiff also alleges that they were recipients of federal funds and contracted with the United States Department of Health and Human Services ("DHHS") to provide medical services to Medicare patients.  (Doc. 1 at ¶¶ 6, 9).

liable for professional negligence, under state law; and (5) HMC, Messaris, and Kothul

committed a "battery," in violation of state law, for not obtaining her informed consent to

undergo a medical procedure.  (Doc. 19 at pp. 8-9).  For remedies, Plaintiff expressly seeks

damages against all five defendants, in excess of $75,000; punitive damages against

Messaris and Singh; injunctive relief against Mt. Nittany, requiring it to modify its practices to

accommodate patients with disabilities; and attorney's fees and costs.  (Id. at ¶ 3 & p.10).

Pending before the Court are two motions (Docs. 24 & 26) to dismiss,

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The first dismissal

motion was filed by HMC, Messaris, and Singh.  The second motion was filed by Mt.

Nittany.  Both motions are ripe for review.  (See Docs. 25, 27, & 29).[2]

II.    Legal Standard

A motion filed under Rule 12(b)(6) contests whether a claimant has stated a

cognizable claim.  See Fed.R.Civ.P. 12(b)(6).  In resolving a motion to dismiss under this

Rule,

> we must "accept all factual allegations as true, construe the complaint in
> the light most favorable to the plaintiff, and determine whether, under any
> reasonable reading of the complaint, the plaintiff may be entitled to
> relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)
> (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir.
> 2008)). While a complaint need only contain "a short and plain statement
> of the claim," Fed. R. Civ. P. 8(a)(2), and detailed factual allegations are
> not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a
> complaint must plead "enough facts to state a claim to relief that is
> plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a
> 'probability requirement,' but it asks for more than a sheer possibility that
> a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 129
> S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels
> and conclusions" are not enough, and a court is not "'bound to accept as

---

[2]      Despite being named in the original complaint, filed on October 14, 2015, (Doc. 1), it is
unclear whether Kothul, pursuant to Rule 4 of the Federal Rules of Civil Procedure, has ever waived
service or been served.

true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoted case omitted).

[W]e thus "conduct a two-part analysis." *Fowler, supra*, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. *Id.* at 210–11. Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoted case omitted).

*Seldomridge v. Penn State Hershey Medical Center*, No. 13- 2897, 2014 WL 2619371, at *3 (M.D. Pa. June 12, 2014)(Caldwell, J.).  With this standard in mind, we turn to Plaintiff's allegations in the amended complaint.

### III.    Plaintiff's Allegations

Plaintiff has Crohn's Disease and Diabetes.  (Doc. 19 at ¶ 11).  As a result of a perianal fistula that originated in 1997, Plaintiff lost nearly two feet from the small intestine. (Id. at ¶ 12).  Plaintiff has also experienced chronic diarrhea and incontinence, and she has had difficulty working, eating, and digesting food.  (See id. at ¶¶ 12, 13).

On October 14, 2013, Messaris, under Kothul's supervision, "perform[ed] an ileostomy on Plaintiff."[3]  (Id. at ¶ 14).  Beforehand, Messaris informed Plaintiff that "she might have a temporary ostomy rather than a health threatening high-output ileostomy."  (Id. at ¶ 15).  Plaintiff, however, ended up with a "very high output ileostomy."  (Id. at ¶ 18).

According to Plaintiff, for patients with Crohn's Disease undergoing a perianal repair, there is a "failure rate" between 50 - 80%.  (Id. at ¶ 16).  Had Plaintiff been informed of said "failure rate," and "properly" informed her of the risks, benefits, and alternatives, she would not have given consent.  (Id. at ¶ 17).

---

[3]     "An ileostomy is defined as an opening into the ileum, part of the small intestine, from the outside of the body. It provides a new path for waste material to leave the body after part of the intestine has been removed. See www.medterms.com/script/main/art.asp?articlekey=22428." *Talbert v. Kaplan*, No. 12-6533, 2013 WL 4434214, at *1, n. 5 (E.D. Pa. Aug. 20, 2013).

Following the medical procedure, in addition to having a high-output ileostomy, Messaris did not monitor Plaintiff's ostomy output.  (Id. at ¶ 19).  Also, on October 17, 2013, Plaintiff, who remained at HMC, experienced leg cramps, and Messaris instructed that she drink a quart of Gatorade.  (Id. at ¶ 26).  Confusingly, Plaintiff alleges that despite Messaris' instructions, and the fact that she was already at a hospital, a medical resident later told her that she should present herself to a local hospital "to be hydrated."  (See id. at ¶ 27).  The following day, on October 18, 2013, Plaintiff still felt "ill."  (See id. at ¶ 20).  Messaris, though, under Kothul's supervision, discharged her from HMC.  (Id.).  After Plaintiff was discharged, she took a 90-mile cab ride "to an empty house."  (Id.).

Approximately 30 hours later, on or about October 20, 2013, Plaintiff drove herself to Mt. Nittany's Emergency Department.  (See id. at ¶ 21).  At Mt. Nittany, Singh did not "adequate[ly]" hydrate Plaintiff, and informed her that, as a patient with Crohn's Disease, she should not have had any Gatorade.  (Id. at ¶¶ 22, 26).  Singh also did not consult with Plaintiff's family physician or gastroenterologist.  (Id.).

On the same date she presented to Mt. Nittany, Plaintiff was due to be discharged.  As she was being discharged, however, Plaintiff experienced renal failure, resulting in her transfer to HMC.  (Id. at ¶¶ 23-24).  After her arrival there, "[HMC] . . . attempted to discharge Plaintiff [back] to her empty house."  (Id. at ¶ 25).  Plaintiff, though, called her son to advocate for her, and arranged for her admission to a nursing home, for two weeks.  (Id.).

Afterwards, between October 21-23, 2013, because Plaintiff was experiencing pain, she was unable to have an ostomy bag attached and remain in place.  (Id. at ¶ 28).  On October 21, in particular, Plaintiff "was transported" from a nursing home to

4

Mt. Nittany's Emergency Department, where she was treated while nurses attempted to fit "new appliances" to her abdomen.  (Id. at ¶¶ 29-30).  "[O]ne doctor" told Plaintiff that she was not sick and should go home.  (Id. at ¶ 31).  Nonetheless, Plaintiff would remain at Mt. Nittany. (Id.).

Two days later, on October 23, 2013, Plaintiff passed out while walking to the bathroom.  (Id. at ¶ 36).  Plaintiff attributes this to dehydration, which intensified "during the multiple ostomy appliance applications," and caused her to develop severe leg, arm, and back spasms.  (Id. at ¶ 33, 36).  That same day, a nurse saw Plaintiff's arm in spasm, and spoke to Singh.  Singh ordered lab tests.  The lab tests showed that Plaintiff's renal functions were nine times higher than normal.  (Id. at ¶ 37).  As a result, CAT Scans were ordered for Plaintiff's abdomen and kidneys, and Singh acknowledged that Plaintiff might be experiencing renal failure.  (Id. at ¶ 38).  In addition, Plaintiff had difficulty sleeping that night because she had developed severe "acid vice-like" rib pain.  (Id. at ¶ 29).

The next day, on October 24, 2013, Plaintiff claims that Singh did not give her IVs or provide her with electrolytes.  (See id. at ¶¶ 32-34).  In Singh's view, although Plaintiff's creatinine level was at 4, lab tests showed that her magnesium and potassium levels were normal.  (Id. at ¶¶ 34, 40).  Thus, Singh told Plaintiff to go home.  (See id. at ¶ 32).  Plaintiff, however, would remain at Mt. Nittany.

On October 26, 2013, while still at Mt. Nittany, the seals on Plaintiff's ostomy bag twice failed, resulting in "terrible" pain.  (Id. at ¶ 41).  Plaintiff asked to speak to Singh about pain management, but when they met, the topic was not discussed.  (Id.).  Plaintiff continued to experience pain, and she was not allowed out of bed without a staff member present.  (Id. at ¶ 42).  Because of the bed restriction, Plaintiff was left "in a pool of bile" until

staff could come to assist her.  (Id.).  That afternoon, Plaintiff then developed "vice-like" rib pain, and endured three, painful "appliance seal failures."  (Id. at ¶ 43).

One day later, on October 27, 2013, a nurse "implored" Singh to help Plaintiff with the overall pain she was experiencing. (See id. at ¶¶ 44).  HMC, though, had been informed of Plaintiff's condition and reserved a bed for her there.  (Id. at ¶ 45).  Plaintiff was then transferred to HMC in an ambulance.  (Id.).

At some point after her arrival at HMC, on October 27th, "personnel" informed Plaintiff that she was "medically ready" for discharge and could be discharged to a non-skilled rehabilitation facility.  (Id. at ¶ 46).  Plaintiff was informed of this despite experiencing painful leg cramps.  (See id. at ¶ 47).  Moreover, after being informed of her eventual discharge, Plaintiff was unable to locate a rehabilitation facility near her home community and was further informed that she did not qualify for home care.  (Id. at ¶¶ 48-49).  Nonetheless, at her request, HMC found a rehabilitation facility for her, at Manor Care, in Carlisle, Pennsylvania, to where she was ultimately transferred.  (Id. at ¶ 50).

When Plaintiff arrived at Manor Care, she learned that HMC had not sent her "pain killer prescriptions or other medication prescriptions."  (Id. at ¶ 51).  As a result, Plaintiff had to wait until the next morning to get her prescriptions.  (Id. at ¶ 52).

On November 15, 2013, Plaintiff left Manor Care.  (Id. at ¶ 53).  Her health did not begin to improve until the ostomy was "reversed" in a surgery performed at Harrisburg Hospital in July 2014.  (Id. at ¶ 54).

IV.    Discussion

A.  Motion to Dismiss filed by HMC, Messaris, and Singh (Doc. 24)

1.  42 U.S.C. § 1983

"Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)(footnote omitted).  "It does not, by its own terms, create substantive rights."  *Id.* (citing *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979)).

> To successfully state a § 1983 claim, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct complained of deprived the plaintiff of rights, privileges, or immunities secured by the laws or the Constitution of the United States. *Rehberg v. Paulk*, 132 S.Ct. 1497, 1501 (2012); *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014).

*Bookwalter v. Keen*, No. 1:15-CV-1291, 2015 WL 6157191, at *3 (M.D. Pa. Oct. 19, 2015)(Caldwell, J.).  "The first step in evaluating a Section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a [federal] right at all.'"  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000)(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998)).

In the amended complaint, Plaintiff claims that HMC and Messaris deprived her of due process "by subjecting her to medical care which recklessly disregarded her well-being and caused her injury."  (Doc. 19 at ¶ 55).  Plaintiff expands on that notion in her brief-in-opposition, contending that she had a "right to appropriate medical care," equivalent to the level of care to be provided to pretrial detainees, but that she did not receive that level of care with respect to the ileostomy Messaris allegedly performed.  (See Doc. 29 at 7, 8).  Accordingly, based on Plaintiff's assertions, we understand her due-process claim to be that

she had a right to medical care and the relevant Defendants, in turn, owed her an affirmative duty of care during that medical procedure.

HMC and Messaris argue that Plaintiff has not only failed to sufficiently allege that they acted under color of state law, but that she does not allege a deprivation of a federal right.  (Doc. 25 at 10-15).

As instructed, *supra*, we begin by determining whether Plaintiff has alleged a deprivation of a federal right.  The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1.  This Clause "is the source of three different kinds of constitutional protection."  *Daniels v. Williams*, 106 S.Ct. 677, 677 (1986)(Stevens, J., concurring).  "First, it incorporates specific protections defined in the Bill of Rights."  *Id.*  "Second, it contains a substantive component sometimes referred to as 'substantive due process[]' . . . ."  *Id.* at 678 (internal quotations and citation omitted).  And, "[t]hird, it is a guarantee of fair procedure, sometimes referred to as 'procedural due process' . . . ."  *Id.*  We understand Plaintiff's § 1983 claim, explained above, as arising under the substantive component of due process.

For Plaintiff to prevail on her substantive-due-process claim, "'the threshold question is whether the behavior of [a] governmental [actor] is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Benn v. Universal Health System, Inc.*, 371 F.3d 165, 174 (3d Cir. 2004)(quoting *Lewis*, 523 U.S. at 847, n. 8); see *Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015)("The shocks-the-conscience test applies regardless of the theory upon which the substantive due process claim is premised.")(citations omitted).  Traditionally, this test has been extremely

demanding.  See *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 885 (1st Cir. 2010)(citing

Matthew D. Umhofer, *Confusing Pursuits: Sacramento v. Lewis and the Future of*

*Substantive Due Process in the Executive Setting*, 41 Santa Clara L.Rev. 437, 475–76

(2001)(noting infrequency of successful claims)); see also, *Sanford v. Stiles*, 456 F.3d 298,

305 (3d Cir. 2006)(per curiam)(stating that, in the context of a state-created danger claim,

the culpability requirement is "often the most difficult element for a plaintiff to prove").

Before determining whether a defendant's behavior reaches the conscience-

shocking level, the exact degree of a defendant's culpability must first be determined.  "The

exact degree of [culpability] necessary to reach the 'conscience-shocking' level depends

upon the circumstances of a particular case," *Miller v. City of Philadelphia*, 174 F.3d 368,

375 (3d Cir. 1999), meaning that the conditions under which a defendant acted are critical.

*Kaucher*, 455 F.3d at 426 (internal quotations and citations omitted); see *Sanford*, 456 F.3d

at 305-06 (citing *Lewis*, 523 U.S. at 850).

According to the Third Circuit:

> A plaintiff faces the highest bar when the state actor accused of wrong-
> doing was faced with a "'hyperpressurized environment'" requiring a
> snap judgment. *Sanford v. Stiles*, 456 F.3d 298, 308–09 (3d Cir. 2006)
> (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 508 (3d Cir. 2003)).
> In such cases, we permit recovery only if the state actor had an actual
> intent to cause harm. *Id.* By contrast, "where deliberation is possible and
> officials have the time to make 'unhurried judgments,' deliberate
> indifference is sufficient." *Id.* at 309 (quoting *Cnty. of Sacramento v.
> Lewis*, 523 U.S. 833, 853 (1998)). Importing aspects of Eighth
> Amendment jurisprudence, we have defined "deliberate indifference" as
> requiring "conscious[ ] disregard [of] 'a substantial risk of serious harm.'"
> *Ziccardi v. City of Phila.*, 288 F.3d 57, 66 (3d Cir. 2002) (quoting *Farmer
> v. Brennan*, 511 U.S. 825, 836 (1994)). In any event, "[m]ere negligence
> is not enough to shock the conscience." *Sanford*, 456 F.3d at 311.

*Vargas*, 783 F.3d at 973-74.  The Third Circuit has also reiterated that acts falling between

the extremes of mere negligence and harmful intent require courts to make closer calls,

based on a context-specific inquiry.  *Kaucher*, 455 F.3d at 426 (quoting *Lewis*, 523 U.S. at 849).

Confronted with the allegations in the amended complaint, we cannot determine the exact degree of the Defendants' culpability.  We know very little, if anything, about the circumstances under which the relevant Defendants -- presuming they were state actors – may have taken action with respect to the alleged medical procedure.  Additionally, it does not appear that either Plaintiff or the relevant Defendants have squarely addressed this issue in their briefs.  That being said, the allegations in the amended complaint do not suggest that the relevant Defendants actually intended to harm Plaintiff.  At the other end of the spectrum, moreover, it is suspect as to whether Plaintiff sufficiently alleges that the behavior of the relevant Defendants amounted to a conscious disregard of a substantial risk of serious harm.

We likewise agree with the relevant Defendants that, based on the present allegations, Plaintiff had no due-process right to medical care when she presented to HMC, for the alleged medical operation.  (Doc. 25 at 13-15).  To that end, "[t]he [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security," and it "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195, 196 (1989).  Thus, only in cases where an individual has had his or her liberty involuntarily restrained by a State have courts been inclined to recognize a due-process right to medical care.  See *Johnson v. Thompson*, 971 F.2d 1487, 1496 (10th Cir. 1992)(recognizing a constitutional right to

10

"adequate" medical treatment only in narrow circumstances – "when the State takes a person into its custody and holds him there against his will."); *Kinzie v. Dallas County Hosp. Dist.*, 239 F.Supp.2d 618, 635 (N.D. Tx. 2003)("True, the right to medical care has been recognized, but only in situations where the state has taken affirmative steps to restrain a person's liberty, as in the case of pretrial detainees.")(citations omitted); accord, *Villalpando v. Denver Health and Hosp. Authority*, 65 F. App'x 683, (10th Cir. 2003)("We have specifically refused to expand th[e] right [to medical care] to the circumstance when an unconfined plaintiff voluntarily availed himself of medical services.")(citing *Johnson*, 971 F.2d at 1496); see also, *Cooleen v. Lamanna*, 248 F. App'x 357, 361 (3d Cir. 2007)(per curiam)("[S]ubstantive due process does protect a right to medical care. Typically, substantive due process rights are invoked by pre-trial detainees and other nonconvicted persons seeking medical care who cannot invoke the Eighth Amendment.")(citing *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987)("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process Clause [which similarly] requires the government to provide appropriate medical care.")).  That is not what Plaintiff appears to allege, however.  Plaintiff also does not cite or discuss any contrary authority to support her claim.

Accordingly, based upon the current allegations, Plaintiff had no right to medical care protected by the "Substantive Due Process Clause," meaning the relevant Defendants owed her no constitutional duty of care, relating to the ileostomy that was allegedly performed.  In turn, Plaintiff does not sufficiently allege a deprivation of a federal right, and her § 1983 claim against HMC and Messaris will be dismissed.

### 2. The ADA and RA

Title II of the ADA "prohibits discrimination based upon a disability by state and local government." *Starego v. N.J. State Interscholastic Athletic Ass'n*, 970 F. Supp. 2d 303, 307-08 (D.N.J. 2013). Title II of the ADA provides in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the RA states that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Given the similar language, the substantive standards for determining liability under § 504 of the RA are equivalent to the ADA, *McDonald v. Dep't of Pub. Welfare*, 62 F.3d 92, 94 (3d Cir. 1995), and claims under both provisions are interpreted consistently. *Emerson v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002).[4]

To determine whether a violation has occurred,

> [a] Court must first determine if there has been a *prima facie* showing of disability discrimination. See *Liberty Res., Inc. v. Phila. Hous. Auth.*, 528 F. Supp. 2d 553, 565 (E.D. Pa. 2007). To establish a *prima facie* showing of disability discrimination under the ADA, a plaintiff must show "1) he or she has a disability; 2) he or she is otherwise qualified; and 3) he or she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under [a] program solely because of her disability." *Id.* (citing *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003)). Only after there has been a *prima facie* showing of disability discrimination must the Court engage in a reasonable accommodation analysis. *Id.*

---

[4]     As expressed by its terms, § 504 of the RA has an additional "federal financial assistance" component, see 29 U.S.C. § 794(a), which is satisfied here. See, e.g., *Juvelis v. Snider*, 68 F.3d 648, 652 (3d Cir. 1995)("As a recipient of federal financial assistance, DPW is subject to the requirements of § 504.")).

*Kongtcheu v. Constable*, No. 12-6872, 2016 WL 270075, at *5 (D.N.J. Jan. 20, 2016).

In the amended complaint, Plaintiff raises claims under both Title II of the ADA and § 504 of the RA.[5]  Specifically, Plaintiff claims the following:

> [HMC] deprived Plaintiff of reasonable modifications of their programs and services to provide her with equal treatment and ability to participate in the receipt of medical services which were adapted to her disabilities by providing services by physicians and surgeons qualified to treat Crohn's patients (sic) with diabetes . . . .

(Doc. 19 at ¶ 57; accord id. at ¶ 58-60).  HMC argues that Plaintiff's disability-discrimination claims should be dismissed because she does not plead a *prima facie* case of discrimination.  (See Doc. 25 at 20).

Based upon our review of the allegations in the amended complaint, we agree with HMC.  Critically, Plaintiff does not sufficiently allege, if at all, that unequal treatment she may have received was because of any disability, or that she was not accommodated with "qualified" medical personnel (or denied other services) because of the same.  In other words, Plaintiff has not established a *prima facie* case of discrimination, and her ADA and RA claims against HMC will be dismissed.[6]

### 3.  EMTALA

Plaintiff also raises an EMTALA claim against HMC, regarding her transfer to Manor Care on October 27, 2013.  (See Doc. 19 at ¶ 63; Doc. 29 at 15-16).  In pertinent part, EMTALA states:

---

[5]     We do not view the amended complaint as asserting a claim pursuant to Title III of the ADA. Regardless, as discussed herein, Plaintiff does not state a *prima facie* case of discrimination.

[6]     We express no opinion about whether Plaintiff sufficiently alleges that HMC qualifies as a "public entity."

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) In general[:] If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . . .

(c) Restricting transfers until individual stabilized

(1) Rule[:] If an individual at a hospital has an emergency medical condition which has not been stabilized . . . the hospital may not transfer the individual unless . . . [(A) certain considerations are satisfied, and] (B) the transfer is an appropriate transfer (within the meaning of paragraph 2) . . . .

See *Torretti v. Main Line Hospitals, Inc.*, 580 F.3d 168, 172 n. 7 (3d Cir. 2009)(quoting from 42 U.S.C. § 1395dd(a)-(c)).  Under EMTALA, civil fines and private causes of action are authorized.  42 U.S.C. § 1395dd(d); *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 251 (1999).

"Congress enacted EMTALA in the mid-1980s based on concerns that, due to economic constraints, hospitals either were refusing to treat certain emergency room

patients or transferring them to other institutions." *Torretti*, 580 F.3d at 173 (citations omitted).  "[T]his practice is known as 'patient dumping.'" *Id.* (citing *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994)).  "Although Congress was concerned that the indigent and uninsured tended to be the primary victims of patient dumping, EMTALA is not limited to these individuals."  *Id.* (citing 42 U.S.C. § 1395dd; *Roberts*, 525 U.S. at 252). Furthermore, only hospitals that voluntarily participate in the Medicare or Medicaid programs and have effective provider agreements must comply with EMTALA.  *Id.* at 173 n. 8.

At present, Plaintiff raises under EMTALA what is known as a "stabilization" claim.  To succeed, Plaintiff must sufficiently allege that, on October 27, 2013: (1) she had an emergency medical condition; (2) HMC actually knew of that condition; and (3) she was not stabilized before being transferred to Manor Care. *Torretti*, 580 F.3d at 178 (quoting *Baber v. Hosp. Corp. of America*, 977 F.2d 872 883 (4th Cir. 1992)).

EMTALA defines "emergency medical condition" as:

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual . . . in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd(e)(1).

"'Regarding the second requirement, [the Third Circuit] has stated that actual knowledge of the emergency medical condition on the part of the hospital is required for a plaintiff to succeed on an EMTALA claim . . . .' *Torretti*, 580 F.3d at 178.  The question of whether a hospital should have known about an emergency medical condition is irrelevant

for the purposes of EMTALA." *Delibertis v. Pottstown Hospital Company, LLC*, No. 14-6971, 2016 WL 245310, at *4 (E.D. Pa. Jan. 21, 2016).

Furthermore, under EMTALA:

> **(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . .
>
> **(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . . .

42 U.S.C. § 1395dd(e)(3).

In this case, Plaintiff has not stated a plausible claim for relief.  According to Plaintiff, before her discharge[7] to Manor Care on October 27, 2013, she experienced painful leg cramps.  Plaintiff, however, does not allege that the leg cramps were associated with any emergency medical condition she may have initially had when she initially presented to HMC on October 27th, see infra.  Nor does Plaintiff present that argument in her brief-in-opposition.  (See Doc. 29 at 15).  Furthermore, assuming that the leg cramps were associated with any emergency medical condition she may have had, we would be hard-pressed to find it plausible that HMC did not stabilize the condition since the original ailments for which she allegedly experienced, and HMC was "informed," apparently abated.  In that sense, we agree with HMC that "to stabilize" or "stabilized" does not require all ailments to be cured, only that no material deterioration of a condition is likely to result from or occur during the transfer.  Moreover, we remain unconvinced that the alleged leg cramps

---

[7]       Under EMTALA, "transfer" and "discharge" can be used interchangeably.  See 42 U.S.C. § 1395dd(e)(4).

qualify as an independent, emergency medical condition. Additionally, Plaintiff does not appear to sufficiently set forth, if at all, that the painful leg cramps were an acute symptom of an emergency medical condition. As well, Plaintiff does not allege that she informed anyone at HMC about the leg cramps to give HMC requisite knowledge of any existing, or still existing, emergency medical condition. Plaintiff's EMTALA claim will be dismissed.[8]

### 4. Abandoned Claims and Requests

Finally, with respect to this particular dismissal motion, HMC contends that, as a matter of law, hospitals cannot be held liable on informed-consent claims. (Doc. 25 at 25-26). HMC, Messaris, and Singh also move for the dismissal of Plaintiff's general request for attorney's fees, contending that she does not state a cognizable claim against them "arising from statutes that authorize recovery of counsel fees." (Id. at 28-29). Similarly, Messaris and Singh move for dismissal of Plaintiff's request for punitive damages, contending that she does not "plead any conduct that would warrant the imposition of [such] damages [against them] and has further failed to plead any facts demonstrating [their] state of mind." (Id. at 28).

Although Plaintiff has filed a brief-in-opposition, she does not address these arguments. Accordingly, we will deem abandoned, and dismiss, the informed-consent claim against HMC, in addition to the requests for attorney's fees (as to HMC, Messaris, and Singh) and punitive damages (as to Messaris and Singh). See *Sexton v. County of York, Pa.*, No. 12-00402, 2012 WL 2192250, at *6 n. 6 (M.D. Pa. June 14, 2012)(Rambo, J.)("Plaintiff failed to address this argument in the brief in opposition to Defendants' motion

---

[8]    Plaintiff also claims that the transfer itself violated EMTALA; however, we do not reach this aspect of her claim since she fails to allege that she had a known, emergency medical condition that was not stabilized. In other words, based upon the current allegations, EMTALA's transfer requirements were not triggered.

to dismiss. Thus, the court *could* dismiss the official capacity claim against Wagner on the additional ground that Plaintiff has abandoned that claim.")(emphasis added)(citing *Hoffman v. Dougher*, No. 05-0906, 2006 WL 2709703, at *4 (M.D. Pa. Sept. 20, 2006)(Conner, J.), in turn, citing *D'Angio v. Borough of Nescopeck*, 34 F.Supp.2d 256, 265 (M.D. Pa. 1999)(McClure, J.)); see also, M.D. Pa. L.R. 7.6 ("Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief . . . .   Any party who fails to comply with this rule shall be deemed not to oppose such motion.").[9]

---

[9]     With respect to the informed-consent claim, in particular, we also agree with HMC that, as a matter of Pennsylvania law, it could not be held liable for failing to obtain Plaintiff's informed consent. The codified law of informed consent in Pennsylvania speaks solely of *physicians'* duties.  See 40 P.S. § 1303.504.  As well, hospitals never traditionally had an independent duty to obtain a patient's informed consent.  See *Friter v. Iolab Corp.*, 607 A.2d 1111, 1113 (Pa. 1992).  Nor could hospitals be held vicariously liable for a physician's failure to obtain informed consent since no hospital has control over the manner in which a physician performs his duty to obtain informed consent.  *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232, 1239 (Pa. 2002).  Furthermore, "Pennsylvania law forbids a claim of corporate negligence against a hospital to be founded upon a theory that the hospital failed to ensure the patient's informed consent."  *Tucker v. Community Medical Center*, 833 A.2d 217, 225 (Pa. Super. Ct. 2003)(citing *Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. 1995)).  However, in a limited situation, where a hospital has assumed an independent duty to obtain informed consent, courts applying Pennsylvania law have been willing to find that a hospital can be held liable on a lack-of-informed-consent claim.  See *Friter, supra*.  But, in the amended complaint, Plaintiff does not appear to raise any allegations of the kind.

     It is also well-established that, under the "American Rule," each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-53 (2010); see *Rinker v. Amori*, No. 15-1293, 2016 WL 1110217, at *10 (M.D. Pa. Mar. 22, 2016)(Mannion, J.)(recognizing that Pennsylvania also adheres to the "American Rule"); accord *Bethlehem Area Sch. Dist. v. Zhou*, 09–3493, 2012 WL 930998, at *4 (E.D. Pa. Mar. 20, 2012)("'Pennsylvania courts have routinely applied the American Rule to deny recovery of attorneys' fees in . . . negligence cases.'")(quoting *Lewis v. Delp Family Powder Coatings, Inc.*, 08–1365, 2011 WL 1230207, at *4 (W.D. Pa. Mar. 31, 2011); *Allegrino v. Conway E & S, Inc.*, 2010 WL 2035658, at *12 (W.D. Pa. May 18, 2010)("[A]ttorney's fees are not available in negligence cases").  At present, we find that Plaintiff does not state cognizable claims against these Defendants, arising under federal law, to which attorney's fees may be permitted, and we are unaware of authority permitting attorney's fees for the state-law claims remaining against Messaris and Singh.

### 5. Summary

Plaintiff does not state a claim under § 1983 against Messaris or HMC, for a deprivation of due process.  Plaintiff also does not state a claim against HMC under Title II of the ADA, § 504 of the RA, or EMTALA.  Furthermore, Plaintiff's informed-consent claim against HMC will be deemed abandoned and dismissed.  Similarly, Plaintiff's request for attorney's fees, at to HMC, Messaris, and Singh will be deemed abandoned and dismissed, as will Plaintiff's request for punitive damages against Messaris and Singh.  The motion to dismiss filed by HMC, Messaris, and Singh will be granted.

### B. Motion to Dismiss filed by Mt. Nittany (Doc. 26)

### 1. ADA and RA

With respect to these claims, Mt. Nittany first argues for dismissal because Plaintiff does not sufficiently allege that she had a disability.  (Doc. 27 at 4-5).  Plaintiff disagrees.  (Doc. 29 at 13).

Relevant here, the term "disability" is defined as follows:

**(1) Disability**

The term "disability" means, with respect to an individual—

**(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual;

**(B)** a record of such an impairment; or

**(C)** being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).  In turn, "major life activities" are defined as follows:

**(2) Major life activities**

**(A) In general**

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(**B**) **Major bodily functions**

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102(2).

In the amended complaint, Plaintiff alleges that she has Crohn's Disease, and that she had also lost approximately two feet of her small intestine.  Furthermore, Plaintiff alleges that she suffered from "chronic diarrhea," had limited use of her digestive system, and was limited in working and eating.  As well, Plaintiff had chronic incontinence.

Based on these allegations, Plaintiff sufficiently alleges a disability.  In so ruling, we draw support from a decision by one of our sister courts:

The [] Third Circuit has held that digestion is a major life activity. *Doe v. County of Centre, PA*, 242 F.3d 437, 447 (3d Cir. 2001). More specifically, eliminating waste from the body is a major life activity, because in its absence, death results. *Fiscus v. Wal–Mart Stores, Inc.*, 385 F.3d 378, 384 (3d Cir. 2004) (elimination of waste from the blood was a major life activity) (citing *Workman v. Frito–Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999)). Several district courts have found that Crohn's disease, which often results in difficulty controlling one's bowels and eliminating waste, is a disability under the ADA. See *Davis v. The Guardian Life Ins. Co.*, 2000 WL 1848596 (E.D. Pa. Dec. 15, 2000); *Wilder v. Southeastern Pub. Serv. Auth.*, 869 F.Supp. 409, 417 (E.D. Va. 1994). Others have found that having Crohn's disease presents a triable issue of material fact as to whether a plaintiff has a substantial impairment in a major life activity. See, e.g., *Duncan v. Quality Steel*

> *Prods., Inc.*, 2007 WL 2156289 (E.D. Mich. July 25, 2007); *Banks v. CBOCS West, Inc.*, 2005 WL 1126913 (N.D. Ill. May 9, 2005).
>
> I agree that having Crohn's disease presents a triable issue of material fact as to whether [the plaintiff] ha[d] a substantial impairment in a major life activity.  Thus, [the ADA Count] will survive [the motion to dismiss].

*Ruder v. Pequea Valley School Dist.*, 790 F.Supp.2d 377, 393 (E.D. Pa. 2011); cf. *Kelman v. Foot Locker*, No. 05-2069, 2006 WL 3333506, at *4 (D.N.J. Nov. 16, 2011)(finding on summary judgment that there was no ADA disability even though the plaintiff had Crohn's Disease).

Next, Mt. Nittany argues that Plaintiff's Title II claim should otherwise be dismissed because she does not allege a *prima facie* case, in that she does not plead that the hospital is a "public entity."  (Doc. 27 at 5-6).  Plaintiff disagrees, appearing to solely argue that Mt. Nittany is "subject to" the ADA because, as alleged, it is a "recipient[] of federal Medicaid funds."  (Doc. 29 at 10).

Under the ADA, "public entity" is defined as follows:

> **(1) Public entity**
>
> The term "public entity" means—
>
> **(A)** any State or local government;
>
> **(B)** any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
>
> **(C)** the National Railroad Passenger Corporation, and any commuter authority . . . .

42 U.S.C. § 12131(1).

Based on the allegations in the amended complaint, coupled with the plain language of the relevant portion of the statutory definition, the only way Mt. Nittany could qualify as a "public entity" is if it were an "instrumentality of a State."  The term is not defined

in the relevant statutes.  Applying rules and canons of statutory interpretation, the growing consensus among the Circuit Courts is that the term "refers to governmental units or units created by them."  *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010); *Green v. New York*, 465 F.3d 65, 79 (2d Cir. 2006); see *Phillips v. Tiona*, 508 F. App'x 737, 754 (10th Cir. 2013)(agreeing with the reasoning of the Second Circuit "that 'instrumentality' refers to a traditional government unit or one created by a government unit."); see also, *Matthews v. Pennsylvania Dept. of Corrections*, 613 F. App'x 163, 169-70 (3d Cir. 2015)(agreeing with the Eleventh Circuit that "'a private corporation is not a public entity merely because it contracts with a public entity to provide some service.'")(quoting, *Edison*, 604 F.3d at 1310). We agree with that reference, and adopt the one set forth above.  In doing so, Plaintiff alleges nothing to plausibly suggest that Mt. Nittany is a governmental unit or one created by a government unit.  Indeed, Plaintiff does not even allege that Mt. Nittany is a public hospital and, contrary to her apparent argument, the mere fact that Mt. Nittany may have been a recipient of federal Medicaid funds is insufficient to demonstrate that it was an "instrumentality of a State."  In other words, Plaintiff does not allege that Mt. Nittany was a "public entity" and her Title II ADA claim against the hospital will be dismissed.

Additionally, with respect to Plaintiff's disability-discrimination claims, which are the same as the ones she raises against HMC, Mt. Nittany argues that Plaintiff fails to allege that she was discriminated against because of any disability.  (See Doc. 27 at 6-7). We agree.  Plaintiff does not allege that unequal treatment she may have received was because of any disability, or that she was not accommodated with "qualified" medical personnel (or denied other services) because of the same.  In other words, Plaintiff has not

established a *prima facie* case of discrimination.  Plaintiff's RA claim against Mt. Nittany will also be dismissed.

### 2.  EMTALA

Mt. Nittany moves to dismiss Plaintiff's stabilization claims under EMTALA. (Doc. 27 at 8-10).  In opposition, Plaintiff first contends that Mt. Nittany violated the statute when the hospital discharged her before being stabilized, "resulting in her having to drive herself back to the [] Emergency Room when she became dehydrated."  (Doc. 29 at 16).  In the amended complaint, however, Plaintiff makes no allegations to that effect; instead, the only time Plaintiff complains about having to drive to a hospital was after her discharge *from HMC*, on October 18, 2013.  (Doc. 19 at ¶¶ 20-22).  Thus, any such claim will be dismissed in light of the present allegations.

Next, in opposition to Mt. Nittany's dismissal motion, Plaintiff argues that the hospital violated EMTALA when she was "re-admi[tted] to [HMC]."  (Doc. 29 at 16).  Plaintiff, though, appears to have been "readmitted to HMC," from Mt. Nittany, on two occasions, and does not explain to which transfer she refers, if not both.  It is also unclear from the face of the amended complaint to which instance she could be referring.

To that end, Plaintiff alleges that, on, or about, October 20, 2013, she drove herself to Mt. Nittany's emergency department, within 30 hours of having been discharged from HMC.  Furthermore, she provides only that she was later transferred back to HMC on that date, after she had experienced renal failure.  (Doc. 19 at ¶¶ 20-24).  While renal failure would seem to qualify as an emergency medical condition, she does not provide any allegations about whether Mt. Nittany provided her with any medical care prior to her transfer to HMC, in order to make it appear plausible that she was "dumped" as a patient,

i.e., that an emergency medical condition was not stabilized.  Furthermore, although Plaintiff claims that she had experienced renal failure on that date, she provides nothing about her condition at the time of transfer, such as the symptoms or ailments she was experiencing. In this regard, Plaintiff's EMTALA claim will be dismissed.

As well, Plaintiff appears to claim that Mt. Nittany violated EMTALA when, on October 27, 2013, the hospital transported her to HMC, in an ambulance.  On that date, Plaintiff claims that she continued to experience the same pain as she had been experiencing in the days prior.  (See Doc. 19 at ¶ 44).  According to Plaintiff, on October 23, 2013, she began experiencing "vice-like" pain in her ribs area, while she was at Mt. Nittany. (See id. at ¶ 39).  Then, three days later, on October 26, Plaintiff's ostomy-bag seals twice failed, resulting in additional pain.  (See id. at ¶ 41).  Plaintiff asked to speak with Singh about the pain, but the issue was not discussed.  (Id.).  That same night, Plaintiff's pain in her ribs area persisted and continued to increase in intensity.  (See id. at ¶ 43).  There were also three additional appliance seal failures that night.  (See id.).  On October 27, HMC "was informed of Plaintiff's condition," and reserved a bed for her there.  (Id. at ¶ 45).  Plaintiff was subsequently transported to HMC in an ambulance.  (Id.).  This occurred after Singh was "implored" to provide "help" to Plaintiff, to which we infer that he did not provide her with any care, much less any stabilizing care.  (See id. at ¶ 44).  Based on these allegations, we find that Plaintiff has sufficiently alleged that she had a known, emergency medical condition that was not stabilized at the time of her discharge to HMC.  This portion of Plaintiff's EMTALA claim will be permitted to proceed.

### 3. Professional Negligence

Pertinent here, Plaintiff claims that Singh and Mt. Nittany departed from the standards of care of the medical and surgical professions.  (Doc. 19 at ¶ 65).  Plaintiff further alleges that Singh was a physician employed by Mt. Nittany.  (Id. at ¶ 10).  Pursuant to Pennsylvania law, Plaintiff also submitted a "certificate of merit," in which it is affirmed that "an appropriate licensed physician has supplied a written statement with respect to the care provided by [Massaris and Singh], that there exists a reasonable probability that the care, skill or knowledge that is the subject of the [amended] complaint fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm."  (Doc. 9).  It is also affirmed that: "With respect to the claims against . . . Mt. Nittany [], the claims of malpractice are based solely on allegations that *other licensed professionals* from whom th[is] Defendant[] [was] responsible deviated from acceptable professional standards, and there is a reasonably probability that the care, skill, or knowledge exercised or exhibited in th (sic) treatment, practice or work that is the subject of the [amended] complaint fell outside acceptable professional standards."  (Id.)(emphasis added).

Mt. Nittany contends that any professional negligence claims against it, regarding "other licensed professionals," should be dismissed, because Plaintiff has not identified anyone other than Singh as being an employee of the hospital.  (Doc. 27 at 13). Mt. Nittany also seeks dismissal because, aside from Singh, Plaintiff has not provided a certificate of merit concerning any other individuals working at Mt. Nittany.  (Id. at 12-13).

Plaintiff does not address this argument in her brief-in-opposition.  We will deem abandoned, and dismiss, the professional negligence claims against Mt. Nittany, save the one regarding Singh.  See also, Pa. R. Civ. P. 1042.3(a)(2), Note.

### 4.  Punitive Damages and Attorney's Fees

Mt. Nittany seeks dismissal of Plaintiff's requests for punitive damages and attorney's fees.   (See Doc. 27 at 10-11).   Notably, Plaintiff does not request punitive damages against Mt. Nittany, (see Doc. 19 at p. 10; Doc. 27 at 10); thus, the argument is moot.   Furthermore, although we *could* deem as abandoned, and dismiss, the request for attorney's fees against Mt. Nittany, we decline to do so at this stage.   In that regard, Plaintiff still has an existing EMTALA claim against Mt. Nittany, and the issue regarding attorney's fees in the EMTALA context is one that should be briefed by the parties.   Thus, as to Mt. Nittany, Plaintiff's request for attorney's fees will not presently be dismissed.

### 5.  Summary

Plaintiff does not sufficiently allege a Title II ADA or § 504 RA claim against Mt. Nittany.   Plaintiff sufficiently alleges an EMTALA claim against Mt. Nittany, insofar as her transfer to HMC, on October 27, 2013, is concerned.   Otherwise Plaintiff fails to state an EMTALA claim against Mt. Nittany.   Plaintiff's professional negligence claim against Mt. Nittany, relating to "other licensed professionals," not including Singh, is deemed abandoned and will be dismissed.   Last, as to Mt. Nittany, Plaintiff's general request for attorney's fees, will be allowed to proceed.   Mt. Nittany's dismissal motion will be granted in part and denied in part.

### C.  Leave to Amend

In civil rights cases, the Third Circuit requires District Courts to extend plaintiffs an opportunity to amend – "irrespective of whether it was requested and irrespective of whether the plaintiff was counseled" – before dismissing a complaint.  See *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir.

2007)(citing *District Council 47 v. Bradley*, 795 F.2d 310, 316 (3d Cir. 1986)).  However, "[a]mong the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."  *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1434 (3d Cir. 1997)(citations omitted).

Although we question the viability of Plaintiff's § 1983 claim, she nonetheless asserts a civil rights claim.  We will therefore adhere to the amendment rule, *supra*, and grant Plaintiff a final opportunity to further amend her pleading, consistent with the contents of this Memorandum.  That being said, it is difficult for us to conclude whether further amendments of the claims discussed would be futile.  The allegations in the amended complaint, though counseled, were difficult to follow at times.  Furthermore, Plaintiff's brief-in-opposition provided little clarity about the claims she is raising.  Nevertheless, we will give Plaintiff a chance to clear up any discrepancies and attempt to sufficiently allege claims for relief.

## V.     Conclusion

The motion (Doc. 24) to dismiss filed by HMC, Messaris, and Singh will be granted.  The motion (Doc. 26) to dismiss filed by Mt. Nittany will be granted in part and denied in part.  An appropriate Order will be issued.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge

**Date Signed**: April 11, 2016