# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

KATHLEEN LANGSTON,      :
    Plaintiff            :
                          :
   v.                     :
                          :     CIVIL NO. 1:15-CV-02027
MILTON S. HERSHEY MEDICAL  :
CENTER, *et al.*,           :
    Defendants       :

## *M E M O R A N D U M*

In this civil action, proceeding by way of a second-amended complaint, Plaintiff raises federal and state-law claims related to the medical care she received at two different Pennsylvania hospitals in 2013.  At present, the Court is faced with <u>two</u> motions filed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that Plaintiff fails to plead federal claims for relief, and <u>another</u>, <u>separate</u> motion filed under Federal Civil Procedure Rule 4(m), asserting that Defendant Walter Kothul ("Kothul") should be dismissed for Plaintiff's failure to serve him.

Ultimately, the Court agrees with Defendants and concludes that Plaintiff does not (1) sufficiently plead federal claims against HMC, Mt. Nittany, Messaris, and Singh; (2) sufficiently plead a claim for attorney's fees; or (3) show good cause for not serving Kothul.  Accordingly, each dismissal motion will be granted.

## *I.*    *Background and Procedural History*

On October 14, 2015, Plaintiff initiated this lawsuit by filing a civil complaint. (Doc. 1).  In the complaint, Plaintiff named the following Defendants: (1) Milton S. Hershey Medical Center ("HMC"), "a hospital affiliated with the University of Pennsylvania" that also had a contract with the United States Department of Health and Human Services ("DHHS") to provide services to Medicare patients and received federal funds; (2) Evangelos Massaris

("Massaris"), "a Surgeon employed by [HMC];" (3) Kothul, the Chief of Colorectal Surgery at HMC; (4) Mt. Nittany Medical Center ("Mt. Nittany"), a hospital organized under Pennsylvania's laws that also had a contract with DHHS to provide services to Medicare patients and received federal funds; and (5) Madhavi Singh ("Singh"), "a Physician employed by Mt. Nittany." (Id. at ¶¶ 6-10; see Doc. 40 at ¶¶ 6-10).[1]  The complaint has since been twice amended. (Docs. 19 & 40).  The most recent, second, amended complaint was filed with the Court's permission, after the Court decided to: (1) grant a Rule 12(b)(6) motion filed by HMC, Messaris, and Singh; and (2) grant in part and deny in part a Rule 12(b)(6) motion filed by Mt. Nittany. (Doc. 37; see Doc. 36).[2]

In the second-amended complaint, Plaintiff sues the same Defendants and alleges the following:

Plaintiff has suffered from Crohn's Disease, an inflammatory bowel disease that causes inflammation of the digestive tract and can result in severe diarrhea, pain, fatigue, and weight loss.[3]  (Doc. 40 at ¶ 11).  She has also suffered from Diabetes; had a perianal fistula that originated in 1997; has lost about two feet from the small intestine as a result of bowel resections; has experienced chronic diarrhea; has had limited use of her

---

[1]    Where necessary, the Court will collectively refer to HMC, Massaris, and Kothul as the "HMC Defendants."  Likewise, the Court will collectively refer to Mt. Nittany and Singh as the "Mt. Nittany Defendants."

[2]    The Court's intent was to grant Plaintiff leave to amend the entirety of her amended complaint, not just the civil-rights claim raised under 42 U.S.C. § 1983.  Perhaps this should (and could) have been expressed more clearly in the Memorandum accompanying the Court's Order. Nonetheless, given the Court's intent, the Court will deny the pending dismissal motions insofar as they, in part, seek dismissal of certain claims on the ground that the Court did not authorize Plaintiff to amend them. (See Doc. 42 at ¶¶ 30-34; Doc. 43 at ¶ 13, 17).

[3]    See Storm v. Colvin, No. 4:14-CV-2060, 2015 WL 7568639, at *1 n.1 (E.D. Mo. Nov. 24, 2015)(defining Crohn's Disease)(citing http://www.mayoclinic.org/diseases-conditions/inflammatory-bowel-disease).

digestive system; and has experienced limitations in major life functions such as working, eating, and digesting.  (Doc. 40 at ¶¶ 11-13).

On October 14, 2013, at HMC, Messaris performed an ileostomy on Plaintiff. (Id. at ¶¶ 14, 15).  In other words, Messaris surgically created an opening into Plaintiff's ileum.[4]  At the time, Messaris was under Kothul's supervision.

The ileostomy did not turn out as Plaintiff expected and was contrary to Messaris's assertions.  (See id. at ¶ 16).  Indeed, the procedure resulted in a "very high output ileostomy" that was health-threatening.  (See id. at ¶¶ 16, 19).  Moreover, "[t]here is a fifty to eighty percent failure rate of perianal repairs in patients with Crohn's Disease."  (Id. at ¶ 17).  "Had Plaintiff been informed of th[is] failure rate . . . and properly informed of the risks, benefits and alternatives," she would not have consented to the procedure.  (Id. at ¶ 18).  Also, Messaris did not monitor her ostomy output.  (Id. at ¶ 20).  Messaris, though, had informed Plaintiff before performing the ileostomy that he knew "very little" about Crohn's Disease.  (Id. at ¶¶ 14, 15).

Three days after Messaris performed the ileostomy, he attempted to discharge Plaintiff from HMC while she was "still ill."  (Id. at ¶ 22).  Plaintiff, however, appealed the attempted discharge and obtained a one-day extension of her stay at HMC. (Id. at ¶ 23).  As such, Plaintiff was not discharged from HMC until October 18th.  (Id. at ¶ 24).

---

[4]     See *Harris v. McDonald*, No. 14-3778, 2016 WL 386688, at *1 n. 6 (Vet. App. Feb. 2, 2016)(citing Dorland's Illustrated Medical Dictionary 913 (32d ed. 2012)); see also, *Talbert v. Kaplan*, No. 12-6533, 2013 WL 4434214, at *1 n. 5 (E.D. Pa. Aug. 20, 2013)(explaining that the ileum is part of the small intestine and that an ileostomy typically provides a new path for waste material to leave the body after part of the intestine has been removed)(citing www.medterms.com/script/main/art.asp?articlekey=22428).

On October 20, 2013, Plaintiff experienced leg cramps.  Plaintiff therefore called HMC.  After Plaintiff called, a resident-physician consulted with Messaris.  The resident then called Plaintiff back, instructing her to drink a quart of Gatorade.  (Id. at ¶ 25).

The next day, October 21st, Plaintiff was unable "to apply a new appliance" and arranged to be transported to Mt. Nittany.  (Id. at ¶ 29).  Upon her arrival at Mt. Nittany, Plaintiff was treated in the Emergency Department.  There, nurses attempted to fit "new appliances" to her abdomen.  (Id. at ¶ 30).  At some point, a doctor told Plaintiff that she was not sick and should go home.  (Id. at ¶ 31).  But Plaintiff was not sent home; instead, she was provided with a room at Mt. Nittany to be kept for observation.  (See id. at ¶¶ 31, 32).

For the next two days, from October 21st to the 23rd, Plaintiff was unable to have an ostomy bag attached because it was excruciatingly painful when attachment attempts were made.  (Id. at ¶ 28).  Moreover, on October 23rd, Plaintiff, who was dehydrated, passed out while walking to the bathroom.  (Id. at ¶ 36).  As Plaintiff fell, a nurse caught her.  (Id.).  A nurse also observed Plaintiff's arm in spasm.  (id. at ¶ 37).  That nurse spoke to Singh about the spasms.  (Id.).  In turn, Singh ordered blood tests which showed that her renal functions were nine times higher than the norm.  (Id.).  As a result, Singh sent Plaintiff for CAT Scans and acknowledged that Plaintiff might be experiencing renal failure.  (Id. at ¶ 38).  Plaintiff was provided with continuous IVs.  (Id.).  Despite the IVs, Plaintiff developed "severe acid vice-like rib pain."  (Id. at ¶ 39).  Those symptoms continued to worsen throughout the day and prevented her from being able to sleep.  (Id.).

The next day, October 24th, Singh told Plaintiff that her creatinine level was four, but that "hopefully the damage was repairable."  (Id. at ¶ 40).  Also, on that day, Singh, who would not consult Plaintiff's "treating physician," would not provide Plaintiff with IVs.

(Id. at ¶ 32, 35).   Nor would Singh give Plaintiff any electrolytes.   To that end, Singh informed Plaintiff that Gatorade was "the worst possible choice" for a patient with Crohn's Disease.  (See id. at ¶¶ 25, 34).  According to Singh, moreover, Plaintiff's lab tests showed that her magnesium and potassium levels were normal.  (Id. at ¶¶ 34, 40).   Nevertheless, "[a]s a result of [Singh's] refusal to give her IVs, and the fact that she was experiencing renal failure, Plaintiff developed severe leg, arm, and back spasms."  (Id. at ¶ 33).   Those symptoms would intensify when ostomy appliance applications were made.  (See id.).

Two days later, on October 26, 2013, the seals on Plaintiff's ostomy bag failed, which she describes as feeling like "pure torture."  (Id. at ¶¶ 40, 43).   In addition, because she had passed out while going to the bathroom three days earlier, she was not allowed out of bed without a hospital staff member being present.  (Id. at ¶ 41).  As such, on at least one occasion when the seals on her ostomy bag failed, she was "left in a pool of bile until the staff could help her."  (Id. at ¶ 40).  Plaintiff also experienced "terrible pain" that day and asked to speak with Singh about pain management.  (Id.).  When Singh met with Plaintiff in the afternoon, they did not discuss the issue of pain management.   (Id.). Consequently, Plaintiff continued to experience "excruciating pain" and she again developed "vice-like rib pain."  (Id. at ¶¶ 41, 42).

Thereafter, on October 27th, a nurse "implored" Singh to help Plaintiff with her pain.  (See id. at ¶ 43).  Plaintiff does not allege how Singh responded or what was done, if anything, in response.

At some point, HMC "[became] informed of Plaintiff's condition" and "immediately reserved a [hospital] bed for her."  (Id. at ¶ 44).  Plaintiff was then transported

to HMC by ambulance.  (Id.).  On the face of the second-amended complaint, it is unclear when all of this occurred.  (But see, Doc. 49 at 16).

On October 30th, at HMC, Plaintiff was informed that she was "medically ready" for discharge and could be discharged to a "non-skilled rehabilitation facility."  (Doc. 40 at ¶ 45).  That morning, Plaintiff experienced "severely painful leg cramps as a result of renal failure and hydration."  (Id. at ¶ 46).  The "staff" at HMC "was aware of" her condition after she complained that she was "too weak" to take care of herself.  (Id. at ¶ 47).

Eventually, at Plaintiff's request, HMC found a rehabilitation facility for her at Manor Care, in Carlisle, Pennsylvania.  (Id. at ¶ 50).  And Plaintiff was transferred to that facility.  (Id.).  HMC, though, did not send Plaintiff's prescriptions or medications to Manor Care.  (Id. at ¶ 51).  Thus, Plaintiff did not receive any medication until October 31st at 5:30 a.m.  (Id. at ¶ 52).

Eventually, in the following month, Plaintiff left Manor Care.  (Id. at ¶ 53).  Plaintiff's health did not improve until July 2014 when "the ostomy was reversed in a surgery performed at Pinnacle Hospital . . . ."  (Id. at ¶ 54).

Based on these allegations, Plaintiff raises a state-created-danger claim against the HMC Defendants, under 42 U.S.C. § 1983; a claim against HMC under Title II of the Americans with Disabilities Act ("ADA"); a claim against Mt. Nittany under Title III of the ADA; a claim against HMC and Mt. Nittany under § 504 of the Rehabilitation Act ("RA"); a claim against HMC, under the Emergency Medical Treatment and Active Labor Act ("EMTALA"); a state-law medical-malpractice claim against all Defendants; and a state-law claim against Messaris and Kothul for their alleged failure to obtain her informed consent before proceeding with the ileostomy.  For remedies, Plaintiff seeks compensatory damages

against all Defendants; injunctive relief against Mt. Nittany; and attorney's fees and costs. (Doc. 40 at p. 13).

Since the filing of Plaintiff's second-amended complaint, two motions have been filed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the basis that Plaintiff fails to state claims for relief.  (Docs. 42 & 43).  The first of these motions was filed by Massaris, Singh, and HMC.  (Doc. 42).  The second of these motions was filed by Mt. Nittany.  (Doc. 43).

In addition, a third motion has been filed under Rule 4(m), seeking Kothul's dismissal for Plaintiff's failure to serve him.  (Doc. 45).

Each motions has been briefed and is ripe for review.

II.    *Legal Standards*

A.  *Rule 12(b)(6)*

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to file a motion to dismiss, contesting whether a claimant has stated a cognizable claim for relief. See Fed.R.Civ.P. 12(b)(6).  In resolving a motion filed under this Rule,

> [a] complaint need only contain "a short and plain statement of the claim," Fed.R. Civ. P. 8(a)(2), and detailed factual allegations are not required. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nonetheless, a complaint has to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, *Twombly*, 550 U.S. at 555, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoted case omitted).
>
> The Third Circuit has described the Rule 12(b)(6) inquiry as a three-part process:

First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013)(quoted cases omitted). See also *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

*Korth v. Hoover,* No. 1:15-CV-2422, --- F.Supp.3d ----, 2016 WL 3088147, at *1 (M.D. Pa. June 2, 2016)(Caldwell, J.); see *Seldomridge v. Penn State Hershey Medical Center*, No. 13-2897, 2014 WL 2619371, at *3 (M.D. Pa. June 12, 2014)(Caldwell, J.).

### B. Rule 4(m)

Rule 4 (m), in pertinent part, provides the following:

If a defendant is not served within [120] days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).[5]

Under this Rule, after a motion has been filed or on its own after notice to a plaintiff, the district court shall first determine whether a defendant has been served within the time established in Rule 4(m).  If service was not made within that time frame, "[t]he district court [shall] determine[] whether good cause exists for a plaintiff's failure to [make] timely service.  If good cause exists, [an] extension must be granted."  *Boley v. Kaymark*, 123 F.3d 756, 758 (3d Cir. 1997)(citations omitted).

---

[5]     Plaintiff's complaint was filed before the December 2015 amendments to the Federal Rules of Civil Procedure, wherein the time for service in Rule 4(m) was amended from 120 to 90 days.

The meaning of "good cause" under Rule 4(m) "has been equated with the concept of 'excusable neglect' under Rule 6(b)(2), and 'requires a demonstration of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified in the rules.'" *McLaud v. Industrial Resources, Inc.*, No. 3:14-CV-737, 2015 WL 737569, at *3 (M.D. Pa. Feb. 20, 2015)(Caputo, J.) (quoting *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097 (3d Cir. 1995), cert. denied, 519 U.S. 815 (1996)). "'[C]ourts have considered such factors as (1) reasonableness of plaintiff's efforts to serve, (2) prejudice to the defendant by lack of timely service, and (3) whether plaintiff moved for an enlargement of time to serve.'" *Id.* at *3 (quoting *McDonald v. SEIU Healthcare Pennsylvania*, No. 13–2555, 2014 WL 4672493, at *6 (M.D. Pa. Sept. 18, 2014)(Conner, C.J.)(quotations and internal alterations omitted), in turn citing *MCI Telecomms.*, 741 F.3d at 1097–98). "Indeed, the 'primary focus' of the good cause inquiry 'is on the plaintiff's reasons for not complying with the time limit in the first place.'" *Id.* (quoting *Boley*, 123 F.3d at 758, in turn quoting *MCI Telecomms.*, 71 F.3d at 1097).

"If good cause does not exist, the district court must consider whether to grant a discretionary extension of time." *Boley*, 123 F.3d at 758 (citing *MCI Telecomm. Corp.*, 71 F.3d at 1098). In embarking on that consideration,

> [a] district court may consider actual notice of the legal action; prejudice to the defendant; the statute of limitations on the underlying causes of action; the conduct of the defendant; and whether the plaintiff is represented by counsel, in addition to any other factor that may be relevant when deciding whether to grant an extension or dismiss the complaint.

*McLaud, supra*, at *3 (M.D. Pa. Feb. 20, 2015)(Caputo, J.)(quoting *Chiang v. U.S. Small Bus. Admin.*, 331 F. App'x 113, 116 (3d Cir. 2009)(citations omitted). Ultimately, if no good cause exists, and a discretionary extension of time will not be granted, a district court shall

dismiss the pending action without prejudice against the defendant that was not served within the established time frame.

Lastly, regarding Rule 4(m), the filing of an amended complaint does not restart the 120-day period as to defendants that are not newly added to the action. *McLaud, supra*, at *3; see *Nayak v. CGA Law Firm*, No. 1:13-CV-2533, 2014 WL 772604, at *2 n.4 (M.D. Pa. Feb. 25, 2014)(Caldwell, J.)(citing *Bolden v. City of Topeka, Kansas*, 441 F.3d 1129, 1148 (10th Cir. 2006)).

### III.    Discussion[6]

### A. Rule 12(b)(6) Motion Filed by HMC, Messaris, and Singh (Doc. 42)

### 1. 42 U.S.C. § 1983

Plaintiff raises a state-created-danger claim against Messaris and HMC. The claim relates to the ileostomy performed on Plaintiff, in October 2013, and is brought under 42 U.S.C. § 1983.  The Court, however, agrees with Messaris and HMC that Plaintiff does not sufficiently plead a § 1983 claim, in that she does not sufficiently allege that these Defendants acted under color of state law.

"To successfully [plead] a § 1983 claim, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct complained of deprived the plaintiff of rights, privileges, or immunities secured by the laws or the Constitution of the United States." *Bookwalter v. Keen*, No. 1:15-CV-1291, 2015 WL 6157191, at *3 (M.D. Pa. Oct. 19, 2015)(Caldwell, J.)(citing *Rehberg v.*

---

[6]    None of the Moving Defendants challenge Plaintiff's state-law claims.  Moreover, on the face of the second-amended complaint, the Court is not reasonably certain that diversity jurisdiction is lacking.  See 28 U.S.C. § 1332.  Accordingly, Plaintiff's state-law claims in the second-amended complaint will be permitted to proceed.  Nevertheless, to be fair, especially in light of the Court's previous (and apparently confusing) decision to grant Plaintiff with leave to amend the entire amended complaint, these Defendants may file a supplemental motion to dismiss, addressing the state-law claims.

*Paulk*, 132 S.Ct. 1497, 1501 (2012); *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014)); see *United States v. Price*, 383 U.S. 787, 794 n. 7 (1966)("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."). "Thus, it is essential to any civil rights claim brought under § 1983 that the plaintiff allege . . . that the defendant was acting under color of law when that defendant allegedly violated the plaintiff's rights." *Walsh v. Pascal*, No. 3:16-CV-1440, 2016 WL 3982468, at *3 (M.D. Pa. July 25, 2016)(Kosik, J.)(citing *Boykin v. Bloomsburg University of Pennsylvania*, 893 F.Supp. 409, 416 (M.D. Pa. 1995)(Muir, J.), aff'd, 92 F.3d 122 (3d Cir. 1996)).

In the second-amended complaint, Plaintiff alleges that HMC was a "hospital affiliated with the University of Pennsylvania," in receipt of federal funds. (See Doc. 40 at ¶ 6). These factual allegations do not sufficiently set forth that HMC acted under color of state law.

Indeed, the allegations do not plausibly suggest that HMC was a state, or public, hospital. And absent allegations showing or suggesting that HMC was a public hospital, Plaintiff must otherwise provide sufficient, well-pleaded allegations to show or suggest that the hospital exercised powers traditionally within the exclusive prerogative of the state; that the hospital acted in concert with state officials; or that the state so far insinuated itself into a position of interdependence with HMC such that the hospital must be recognized as a joint participant in the alleged misconduct. See *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009). But Plaintiff has not provided allegations of the kind.

To that end, HMC's mere "affiliation" with the University of Pennsylvania[7] does not plausibly show or suggest that Defendant was a public hospital or that state action could otherwise be attributed to it.   An "affiliation" could be an infinite number of things. Plaintiff does not leave clues in the second-amended complaint as to the meaning she attributes to the term.   And the Court will not speculate.[8]   Moreover, the Court will not consider Plaintiff's factual allegations on this point that are included in her brief in opposition, (see Doc. 49 at 8), but not included in the second-amended complaint.   See *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")(alteration, citation, and internal quotation marks omitted).

As well, Plaintiff's allegations that HMC had a contract with DHHS to treat Medicare patients and received federal funding does not plausibly suggest that HMC was a public hospital or that state action could be attributed to it.   See *Long v. Administration of Montgomery Hosp. of Norristown, PA*, No. CIV. A. 2000-CV-1056, 2000 WL 1593980, at *2 (E.D. Pa. Oct. 25, 2000)("The provision of hospital services is not a function reserved exclusively to the state" and "[t]he mere fact that Montgomery Hospital has a contract with the United States to provide medical services in exchange for payments from Medicare does not [otherwise] transform the hospital into a state actor."); see also, *Blum v. Yaretsky*,

---

[7]    Plaintiff continues to confuse Pennsylvania State University (Penn State) with the University of Pennsylvania (Penn).   (Compare Doc. 40 at ¶ 6 with Doc. 49 at 8).   Regardless of her intent, Plaintiff's § 1983 claim is subject to dismissal because she does not sufficiently allege state action.

[8]    In past cases, HMC has stated that it is an operating division of Penn State.   See *Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F.Supp.2d 745, 756 n. 4 (M.D. Pa. 2012)(Kane, J.)(noting the same).   But this Court may not take judicial notice of those proceedings or records so as to supply facts essential to this case.   See *id.* (citing *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983); *Rickett v. Jones*, 901 F.2d 1058, 1062 n. 5 (11th Cir. 1990)).

457 U.S. 991, 1011 (1982)(finding no state action despite state subsidization of nursing homes and state payment of the medical expense of 90% of the nursing homes' patients); accord *Osei v. La Salle University*, 493 F. App'x 292, 295 (3d Cir. 2012)("[Government] contributions to otherwise private entities, no matter how great those contributions may be, will not of themselves transform a private actor into a state actor.")(quoting *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 97 (3d Cir. 1984), cert. denied, 471 U.S. 1015 (1985)).

Plaintiff does not sufficiently allege that HMC acted under color of state law.

In a similar vein, Plaintiff does not sufficiently allege that Messaris acted under color of state law.  Plaintiff attempts to allege as much by alleging that Messaris was employed by HMC.  (Doc. 40 at ¶ 7).  But given the Court's conclusion with respect to HMC, *supra*, Messaris's employment at the hospital means he did not act under color of state law. There are also no other allegations in the second-amended complaint to plausibly suggest that state action could be attributed to him.  Cf. *Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F.Supp.2d 745, 757 (M.D. Pa. 2012)(Kane, J.)(holding that physicians who participate in child-abuse investigations qualify as state actors under *Kach's* third test).

Accordingly, the Court finds that Plaintiff does not sufficiently allege that HMC and Messaris acted under color of state law.  As to HMC and Messaris, Plaintiff's § 1983 claim will be dismissed.[9]

### 2. The ADA and RA

Next, Plaintiff claims that HMC was in violation of Title II of the ADA and § 504 of the RA.  According to Plaintiff, "[at HMC] . . . [she was] deprived of the receipt of medical services which would have been equal to that afforded to a patient receiving

---

[9]   Based on the allegations in the second-amended complaint, the same result would be reached with respect to Kothul.

services who was not suffering from her disabilities." (See Doc. 40 at ¶¶ 57, 64). Furthermore, Plaintiff claims that "[she was] deprived of reasonable modifications of their programs and services which would have provided her with equal treatment and ability to participate in the receipt of medical services adapted to her disabilities by providing services by physicians and surgeons qualified to treat Crohn's patients with diabetes . . . ." (See id. at ¶¶ 58, 65). As well, Plaintiff claims that she was so "deprived" "on the basis of her handicaps." (See id. at ¶ 65).

Title II of the ADA "prohibits discrimination based upon a disability by state and local government." *Starego v. N.J. State Interscholastic Athletic Ass'n*, 970 F. Supp. 2d 303, 307-08 (D.N.J. 2013). Title II provides in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the RA states that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The substantive standards for determining liability under the RA are equivalent to those standards for determining liability under the ADA, *McDonald v. Dep't of Pub. Welfare*, 62 F.3d 92, 94 (3d Cir. 1995), and claims under both provisions are interpreted consistently. *Emerson v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002).[10]

---

[10]     As expressed by its terms, § 504 of the RA has an additional "federal financial assistance" component, see 29 U.S.C. § 794(a), which is satisfied here. See, e.g., *Juvelis v. Snider*, 68 F.3d 648, 652 (3d Cir. 1995)("As a recipient of federal financial assistance, DPW is subject to the requirements of § 504.")).

To determine whether a violation of either statute has been sufficiently alleged,

> [a] Court must first determine if there [is] a *prima facie* showing of disability discrimination. See *Liberty Res., Inc. v. Phila. Hous. Auth.*, 528 F. Supp. 2d 553, 565 (E.D. Pa. 2007). To establish a *prima facie* showing of disability discrimination under the ADA, a plaintiff must show "1) he or she has a disability; 2) he or she is otherwise qualified; and 3) he or she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under [a] program solely because of her disability." *Id.* (citing *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003)). Only after there has been a *prima facie* showing of disability discrimination must the Court engage in a reasonable accommodation analysis. *Id.*

*Kongtcheu v. Constable*, No. 12-6872, 2016 WL 270075, at *5 (D.N.J. Jan. 20, 2016)(footnote omitted).

Here, the Court, like HMC, struggles to see how Plaintiff has pleaded a plausible, *prima facie* claim of disability discrimination.  At best, Plaintiff conclusively alleges that she was deprived of programs, treatments, and services on the basis of her disabilities.  But she does not provide sufficient, well-pleaded allegations suggesting that was the actual case.  On the face of the second-amended complaint, it is also unclear what exactly Plaintiff believes she was deprived of.  To the extent her belief is merely that she was entitled to a higher-level, or quality, of care, or that the care she actually did receive was inadequate, or otherwise questions her medical treatment, the claim sounds in medical malpractice or negligence, not the ADA or RA.

Plaintiff's ADA and RA claims against HMC will be dismissed.

15

### 3. EMTALA[11]

Plaintiff also raises an EMTALA claim against HMC.  According to Plaintiff, "HMC violated [EMTALA] by discharging [her] when she had been admitted for emergency treatment and[] transferring her to [Manor Care], when her condition was not stabilized." (Doc. 40 at ¶ 68).  Regarding the transfer, in particular, Plaintiff complains that she was not transferred to Manor Care with her prescribed medications.  (Doc. 40 at ¶¶ 51-52, 68).

In pertinent part, EMTALA provides:

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . . .

---

[11]     Plaintiff abandoned her EMTALA claim against Mt. Nittany.  (Doc. 41).

### (c) Restricting transfers until individual stabilized

### (1) Rule

> If an individual at a hospital has an emergency medical condition which has not been stabilized . . . the hospital may not transfer the individual unless . . . [(A) certain considerations are satisfied, and] (B) the transfer is an appropriate transfer . . . .

See 42 U.S.C. § 1395dd(a)-(c)).  Summarized, "EMTALA requires hospitals to give certain types of medical care to individuals presented for emergency treatment: (a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities."  *Torretti v. Main Line Hospitals, Inc.*, 580 F.3d 168, 172-73 (3d Cir. 2009)(citations omitted).

"Congress enacted EMTALA in the mid-1980s based on concerns that, due to economic constraints, hospitals either were refusing to treat certain emergency room patients or transferring them to other institutions."  *Id.* at 173 (citations omitted).  "[T]his practice is known as 'patient dumping.'"  *Id.* (citing *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994)).  "Although Congress was concerned that the indigent and uninsured tended to be the primary victims of patient dumping, EMTALA is not limited to these individuals."  *Id.* (citing 42 U.S.C. § 1395dd; *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 252 (1999)).  Furthermore, only hospitals that voluntarily participate in the Medicare or Medicaid programs and have effective provider agreements must comply with EMTALA.  *Id.* at 173 n. 8.

Under EMTALA, civil fines and private causes of action are authorized for individuals who suffer personal harm as a direct result of a hospital's violation of the statute.  *Id.* (citing 42 U.S.C. § 1395dd(d)); see *Roberts*, 525 U.S. at 251.  "While an EMTALA action usually will be brought in conjunction with a state statutory claim or common-law medical

malpractice or negligence action arising out of the same events, [EMTALA] does not create a federal cause of action for malpractice." *Torretti*, 580 F.3d at 173-74 (citations omitted). Thus, "[l]iability is determined independently of whether any deficiencies in the screening or treatment provided by [a] hospital may be actionable as negligence or malpractice . . . as the statute was aimed at disparate patient treatment." *Id.* at 174.

Plaintiff raises what is known as a "stabilization" claim. See *id.* at 178 ("The Torretti's alleged a 'stabilization' claim – that defendants violated EMTALA because they did not stabilize her emergency condition and inappropriately transferred her."). "Under this theory, EMTALA requires [Plaintiff to allege that] (1) [she] had 'an emergency medical condition; (2) [HMC] actually knew of that condition; [and] (3) [she] was not stabilized before being transferred [to Manor Care in accordance with § 1395dd(c)(2)].'" See *id.* (quoting *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992)).

EMTALA defines "emergency medical condition" to mean:

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual . . . in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd(e)(1).

"'Regarding the second requirement, [the Third Circuit] has stated that actual knowledge of the emergency medical condition on the part of the hospital is required for a plaintiff to succeed on an EMTALA claim . . . .' *Torretti*, 580 F.3d at 178. The question of whether a hospital should have known about an emergency medical condition is irrelevant

for the purposes of EMTALA." *Delibertis v. Pottstown Hospital Company, LLC*, No. 14-6971, 2016 WL 245310, at *4 (E.D. Pa. Jan. 21, 2016).

Furthermore,

> **(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . .

> **(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . . .

42 U.S.C. § 1395dd(e)(3).

In analyzing Plaintiff's EMTALA claim, she does not deny that she was admitted to HMC upon her arrival at the hospital.  (Doc. 40 at ¶ 44, 68; Doc. 49 at 16).  This is a crucial point.  The Court agrees with the thorough and persuasive interpretation of EMTALA's stabilization requirement set forth in *Mazurkiewicz v. Doylestown Hosp.*, 305 F.Supp.2d 437 (E.D. Pa. 2004).  In that case, a sister court adopted the reasoning of the Fourth[12], Ninth[13], and Eleventh[14] Circuits, and "conclude[ed] that the most 'persuasive synthesis' of the case law, the legislative history of EMTALA and the statutory language is that 'admission [of a patient] is a defense so long as admission is not subterfuge.'" *Hollinger v. Reading Health System*, No. 15-5249, 2016 WL 3762987, at *8 (E.D. Pa. July 14, 2016) (quoting *Mazurkiewicz*, 305 F.Supp.2d at 447); see also, *Smith v. Albert Einstein Med. Ctr.*, 378 F. App'x 154, 157 (3d Cir. 2010)(per curiam)("In *Torretti*, we explained that, under the

---

[12]     *Bryan v. Rectors and Visitors of the Univ. of Virginia*, 95 F.3d 349 (1996).

[13]     *Bryant v. Adventist Health Sys.*, 289 F.3d 1162 (2002).

[14]     *Harry v. Marchant*, 291 F.3d 767 (2002).

applicable regulation, EMTALA's requirements are triggered when an 'individual comes to the emergency department' and that person only does so if that person is not already a 'patient.'").   Since the Court agrees with that interpretation of EMTALA's stabilization requirement, the rule from *Mazurkiewicz* will be adopted.   Thus, the Court "will consider [Plaintiff's] admission [to HMC as] a defense to EMTALA liability permitted that [the] admission was not a deliberate effort [by HMC] to avoid EMTALA obligations."   *Hollinger, supra*, at *9.

In its brief in support, HMC raises this defense.   (Doc. 44 at 27-28).   And Plaintiff does not appear to respond to it.   (See Doc. 49 at 16-17).   Moreover, based on what is pleaded in the second-amended complaint, Plaintiff does not allege that her admission to HMC was a subterfuge to avoid EMTALA obligations.   Cf., e.g., *Morgan v. North Mississippi Medical Center*, 403 F.Supp.2d 1115, 1129 (S.D. Ala. 2005)(finding that plaintiff successfully pleaded a subterfuge theory of liability).   Nor does the Court necessarily infer such a contention from her allegations even though she was allegedly admitted and discharged on the same date.[15]   Consequently, HMC would not have been required to stabilize Plaintiff under EMTALA before she was transferred to Manor Care.

Based on the foregoing, the Court concludes that HMC had no duty to stabilize whatever emergency medical condition Plaintiff may have had at the time of her discharge to Manor Care.   And since HMC had no duty to stabilize her in accordance with EMTALA, it reasonably follows from the statutory language that HMC had no duty to transfer

---

[15]     It is unclear from the second-amended complaint when Plaintiff was admitted to HMC.  (See Doc. 40 at ¶¶ 43-50).  But Plaintiff apparently clarifies that she was admitted and discharged on the same date.  (See Doc. 49 at 16).

Plaintiff in accordance with EMTALA's requirements.  Plaintiff's EMTALA claim against HMC will be dismissed.

### 4. Attorney's Fees

HMC, Messaris, and Singh move for the dismissal of Plaintiff's request for attorney's fees.  (Doc. 44 at 28-29).[16]   Under the "American Rule," each litigant pays her own attorney's fees, win or lose, unless a statute or contract or some other established exception provides otherwise.  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-53 (2010); see *Rinker v. Amori*, No. 15-1293, 2016 WL 1110217, at *10 (M.D. Pa. Mar. 22, 2016)(Mannion, J.)(recognizing that Pennsylvania also adheres to the "American Rule").

Here, the Court has determined that Plaintiff's claims under § 1983, the ADA, the RA, and EMTALA are subject to dismissal.  To the extent attorney's fees may be awarded under those statutes, Plaintiff has no present recourse.  In addition, the Court is unaware of any statutory authority or established exceptions allowing for attorney's fees for the state-law claims raised against these Defendants, in the second-amended complaint. See also, *Sayler v. Skutches*, 40 A.3d 135, 141 (Pa. Super. Ct.)(concluding that the MCARE Act does not increase a litigant's damages by an additional award of attorney's fees), appeal denied, 54 A.3d 349 (Table) (Pa. 2012); *Bethlehem Area Sch. Dist. v. Zhou*, 09–3493, 2012 WL 930998, at *4 (E.D. Pa. Mar. 20, 2012)("'Pennsylvania courts have routinely applied the American Rule to deny recovery of attorneys' fees in . . . negligence cases.'")(quoting *Lewis v. Delp Family Powder Coatings, Inc.*, 08–1365, 2011 WL 1230207, at *4 (W.D. Pa. Mar. 31, 2011).  Nor is the Court aware of anything to remotely suggest that a contract exists providing for the award of attorney's fees for the prevailing party.

---

[16]      Plaintiff does not address this issue in her brief in opposition.  (But see, Doc. 41).

Plaintiff does not make out a plausible claim for attorney's fees.  Accordingly, her request for attorney's fees, as to HMC, Messaris, and Singh, will be dismissed.

### 5.  Summary

Plaintiff does not sufficiently plead federal claims against HMC and Messaris; consequently, as to those Defendants, Plaintiff's claims under § 1983, the ADA, the RA, and EMTALA will be dismissed.  Additionally, with respect to HMC, Messaris, and Singh, Plaintiff does not sufficiently plead a claim for attorney's fees.  Overall, the motion to dismiss filed by HMC, Messaris, and Singh will be granted.

### B.  Rule 12(b)(6) Motion Filed by Mt. Nittany (Doc. 43)

### 1.  The ADA and RA

Plaintiff raises claims against Mt. Nittany under Title III of the ADA and § 504 of the RA.  Mt. Nittany moves for dismissal on the ground that, among other things, Plaintiff does not sufficiently allege she was discriminated against on the basis of her alleged disabilities.  (Doc. 48 at 6, 7).

The basis of Plaintiff's disability-discrimination claims against Mt. Nittany is the same as those raised against HMC, *supra*.  (See Doc. 40 at ¶¶ 57-65).  To make out a claim under Title III or the RA, a plaintiff must allege, among other things, that she was discriminated against on the basis of a disability.  See *Hollinger, supra*, at *9 (quoting *Haas v. Wyoming Valley Health Care Sys.*, 465 F.Supp.2d 429, 433 (M.D. Pa. 2006)(Caputo, J.)(setting forth the elements of a Title III claim)); see also, *Emerson*, *supra*, 296 F.3d at 189.  Plaintiff, though, does not sufficiently allege that she was deprived or denied of any care, service, or treatment at Mt. Nittany on the basis of any alleged disabilities.  Also, again, to the extent Plaintiff's general belief is that she was entitled to a higher-level, or

quality, of care, or that the care she actually did receive was inadequate, or otherwise questions her medical treatment, the claim sounds in medical malpractice or negligence, not the ADA or RA.  Plaintiff's ADA and RA claim against Mt. Nittany will be dismissed.

### 2.  Attorney's Fees

Mt. Nittany moves for the dismissal of Plaintiff's request for attorney's fees. (Doc. 48 at 8).[17]  Here, the Court has determined that Plaintiff's statutory claims of disability discrimination are subject to dismissal.  To the extent attorney's fees may be awarded under those statutes, Plaintiff has no present recourse.  In addition, the Court is unaware of any statutory authority or established exceptions allowing for attorney's fees for the state-law claims raised against Mt. Nittany, in Plaintiff's second-amended complaint.  See also, *Sayler*, *supra*, 40 A.3d at 141; *Zhou*, *supra,* at *4.  Nor is the Court aware of anything to remotely suggest that a contract exists providing for the award of attorney's fees.  Plaintiff's request for attorney's fees as to Mt. Nittany will be dismissed.

### 3.  Summary

Plaintiff does not sufficiently allege a Title III ADA or § 504 RA claim against Mt. Nittany; consequently, those claims will be dismissed.  Additionally, with respect to Mt. Nittany, Plaintiff does not plead a plausible claim for attorney's fees.  That claim will also be dismissed.  Finally, overall, the motion to dismiss filed by Mt. Nittany will be granted.

### C.  Leave to Amend

In cases concerning alleged civil-rights violations, the Third Circuit requires District Courts to extend plaintiffs an opportunity to amend – "irrespective of whether it was requested and irrespective of whether the plaintiff was counseled" – before dismissing a complaint.  See *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251

---

[17]    Plaintiff does not address this issue in her brief in opposition.  (But see, Doc. 41).

(3d Cir. 2007)(citing *District Council 47 v. Bradley*, 795 F.2d 310, 316 (3d Cir. 1986)). However, "[a]mong the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1434 (3d Cir. 1997)(citations omitted).

Here, leave to amend will be denied.   The Court has already provided Plaintiff with leave to amend.   Not to forget, she had already filed an amended complaint as of right.   Based on the contents of Plaintiff's filings, including her multiple pleadings, it would be futile to allow Plaintiff to file what would amount to her third-amended complaint.   The Court is further concerned that Defendants would be prejudiced by likely having to litigate a third round of Rule 12(b) motions due to no fault of their own.   Leave to amend will be denied.

### D.  Rule 4(m) Motion Filed on Kothul's Behalf (Doc. 45)

Ten months have passed since Plaintiff initiated this lawsuit by filing a civil complaint.  (See Doc. 1).  Despite claiming, without evidence, that she mailed a waiver-of-service form to Kothul, at no point has Plaintiff received executed forms from him. Moreover, Plaintiff has not served Kothul.  Nor has she shown good cause in defending against this motion.  To that end, Plaintiff argues that she was unaware that Kothul had not waived service.  (Doc. 50).  According to Plaintiff, this resulted from the fact that two law firms entered their appearances and, somehow, that confused her.  (See id.).  The fact of the matter, however, is that only five defendants are named in this case.   With the assistance of counsel, it should not be so difficult to determine which Defendants have executed waiver-of-service forms, been served, or had counsel enter an appearance.  It is also disingenuous for Plaintiff to suggest that she was unaware that Kothul had not

executed a waiver-of-service form until this particular dismissal motion was filed.   Nearly four months ago, this Court noted that it did not appear Kothul had waived service or been served.   (Doc. 36 at 2 n. 2).   And, since then, Plaintiff has not filed a motion seeking an extension of time to serve him or any other explanation.

In short, the Court does not find good cause for Plaintiff's failure to serve Kothul within the time established by the Federal Rules of Civil Procedure.   Also, the Court will not exercise its discretion to allow Plaintiff more time to attempt to serve Kothul.   The Rule 4(m) motion will be granted and Kothul will be dismissed from the lawsuit without prejudice.

IV.    *Conclusion*

Plaintiff does not sufficiently plead federal claims against HMC, Mt. Nittany, Messaris, and Singh.   Based on the circumstances, moreover, Plaintiff does not plead a plausible claim for attorney's fees.   Also, Plaintiff has not served Defendant Kothul, the time for serving him has lapsed, and Plaintiff does not show good cause for her failure to timely effectuate service.   Furthermore, the Court declines to exercise its discretion to give Plaintiff additional time to serve Kothul.   Accordingly, the Court will grant the motion (Doc. 42) to dismiss filed by HMC, Messaris, and Singh; the motion (Doc. 43) to dismiss by Mt. Nittany; and the motion (Doc. 45) to dismiss Kothul as a Defendant for untimely service.   An appropriate Order will be issued.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge

**Date Signed**: August 16, 2016